550 A.2d 389

**BOATEL INDUSTRIES, INC. t/a Bluewater Marine
of North America**

v.

**James N. HESTER, et al.**

**No. 306, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Nov. 30, 1988.

286

288

Diana G. Motz (Dana Whitehead and Frank, Bernstein, Conaway & Goldman, on the brief), Baltimore, for appellant.

Ben Cotten (Patricia R. Collins and Cotten, Day & Selfon, on the brief), Washington, D.C., for appellees, James and Sharon Hester.

Elaine R. Lubin (Andrew L. Lipps, John Ferguson and Swidler & Berlin, Chartered, on the brief), Washington, D.C., for appellee, Executive Services, Inc.

Argued before BLOOM, WENNER and POLLITT, JJ.

POLLITT, Judge.

This case demonstrates the real-life consequences for some individuals who ignore the old maxim that it may be unwise to mix business with pleasure. The appellees in the instant case sought to enjoy all of the financial benefits of setting up and maintaining a corporate business, yet when that status later worked to their detriment, they attempted to disavow it on the grounds that it was only a "sideline" and essentially not the "business" which they had represented it to be. In this case, at least, they cannot have it both ways.

On 21 August 1985, appellees James N. Hester and Sharon E. Hester entered into a contract of sale under which they agreed to purchase a 51 foot Bluewater power boat manufactured by Boatel Industries, Inc. Under the terms of the contract Mr. Hester agreed to demonstrate and promote the Bluewater line of boats, in return for which the manufacturer would substantially reduce the purchase price. On 17 October 1986 Mr. Hester, his wife, and a corporation of which Mr. Hester is the sole stockholder,

Bluewater Cruisers of Annapolis, Inc., filed a suit against the manufacturer of the boat, Boatel Industries, Inc., and the dealer which sold the boat, Executive Services, Ltd. Citing dozens of minor as well as major defects in the boat, the Hesters alleged breach of warranty and fraud on the part of both defendants, and contended that appellees had successfully revoked acceptance of the contract. Executive Services cross-claimed against Boatel for any liability found on its part, charging that "such liability will have been brought about solely by the acts, omissions, conduct and negligence of the manufacturer and designer, Boatel Industries, Inc."

Following an 8–day trial in the Circuit Court for Anne Arundel County, Judge Bruce C. Williams presiding, the jury returned a verdict against Boatel only in the amount of $255,000, finding that the Hesters had justifiably revoked acceptance of the boat (Count I), that Boatel had breached warranties to the Hesters (Count II), and that Boatel had made false or misleading representations to the Hesters (Count III). On 13 October 1987, Judge Williams ordered that Boatel pay attorney's fees and costs of $53,709.78 to the Hesters and of $15,261.55 to Executive Services, Ltd. Boatel appeals both the judgment on the jury verdict and the awards of counsel fees to both parties.

We shall reverse, holding that Boatel had successfully limited the Hesters' remedies to repair or replacement of defective parts.

### Facts

During the fall of 1984, James and Sharon Hester began looking for a boat to replace their 31 foot Silverton. In early May of 1985, they responded to a magazine advertisement for Boatel boats by contacting the local dealer, Executive Services Ltd. Soon thereafter, Hester went for a demonstration ride with the owner of Executive Services, Arthur Esch, on Esch's 51 foot Boatel Bluewater Cruiser, and obtained some additional sales literature from him. Hester felt that the original price of over $238,000 quoted

by Mr. Esch was "definitely out of my range." Even the less fully equipped model, at $221,250, appeared to be unaffordable. Esch and Hester were able to arrive at an arrangement, however, which would allow Hester to receive a substantial "dealer discount" on the boat.

After making a $15,000 down payment, Mr. Hester, on 21 August 1985, signed a written agreement with Esch which would lower the total cost of the boat to $192,000. Under the terms of the agreement, Boatel provided a letter to Hester to assist him in obtaining financing for the boat. The letter indicated that Hester had made a deposit of $44,250 (consisting of the $15,000 down payment and $29,-250 in "dealer discounts"), leaving an unpaid balance of $177,000. In return, Mr. and Mrs. Hester agreed, in pertinent part, to:

> Immediately and not later than December 31, 1985 sell their Silverton boat and place the net proceeds . . . into an escrow account in a Maryland bank assigned to Arthur Esch as custodian. . . .

and most significantly, they agreed that:

> The planned course of action is that Mr. and Mrs. Hester and their company Bluewater Cruisers of Annapolis will be long term successful sub-dealers for Bluewater [Boatel]. Each year they would sell the previous year's demonstrator at a profit and prior to the Annapolis Boat Show receive a new demonstrator.

Hester then formed a corporation, Bluewater Cruisers of Annapolis, the avowed purpose of which was to demonstrate the yachts to other prospective buyers. Some of the anticipated benefits of this corporate status included: the $29,000 reduction in the sales price of the boat; the elimination of the $8,000 Maryland excise tax on the boat; and possible substantial tax write-offs for expenses incurred in showing the boat.

Hester took delivery of the Boatel Bluewater Cruiser on 23 August 1985. With the purchase of the boat, Hester

received Boatel's Bluewater Limited warranty, which provides, in pertinent part:

> THERE ARE NO WARRANTIES EXPRESS OF [SIC] IMPLIED (INCLUDING WARRANTIES OR [SIC] MERCHANTABILITY AND OF FITNESS), ON PRODUCTS MANUFACTURED BY BLUEWATER CRUISERS EXCEPT THAT BLUEWATER CRUISERS will through its selling dealer, replace or repair, at BLUEWATER CRUISERS option any part (except as hereinafter provided) which is proven to its satisfaction to be defective under normal use and service within twelve (12) months from the date of delivery to the first owner if the part is returned, transportation prepaid, within thirty (30) days after the defect is discovered, to the DEALER or to such other point of manufacture as BLUEWATER CRUISERS may designate. [emphasis in original]

The warranty further provided that:

> The foregoing is made in lieu of all other obligations or liabilities on the part of BLUEWATER CRUISERS, and the buyer waives all other warranties, guarantees or liabilities expressed or implied arising by law or otherwise (including without limitation any obligation of BLUEWATER CRUISERS for consequential damages.) [1]

On delivery, Executive Services arranged for the boat to be "prepped" by its designated service agent, Kopel's boatyard. This service entails basic assembly of certain items such as bridge parts and tarps, placing of kitchen utilities and furniture, and the installation of communications equipment. When the boat was returned to Mr. Hester over a month later, he noted there were still as many as 33 items which needed to be fixed or adjusted to his specifications. On 5 October, there was "still work that had to be done on the boat"; however, because the Annapolis boat show was the following weekend and because "there was no other time to get [the boat] up" to Annapolis, Mr. Hester, accompanied by several friends, transported the yacht to Annapo-

---

**1.** Bluewater Cruisers is a trade name of Boatel Industries, Inc.

lis that weekend. At the show a Boatel representative, Mr. Esch, and Mr. Hester all assisted in showing the boat, handing out promotional materials, and answering questions from at least 96 prospective buyers. For each of the next 5 or 6 weekends following the show, Hester continued to take the boat out to demonstrate it to prospective buyers. He characterized his promotional efforts over this period as "very intense."

It was during one such demonstration, on 24 November 1985, that Hester encountered his first major problem while operating the boat. On a clear day with one to two foot waves, Hester was operating the boat at about 14–15 knots when he and his two passengers heard a loud "cracking" in the hull of the boat. Mr. Hester immediately decided to return to harbor, but reported that "from then on it wasn't just like it would snap once. Every time you hit a wave there was a tremendous cracking and popping throughout the boat."

Hester immediately contacted Mr. Esch, who suggested that he return the boat to Kopel's if possible. Hester did so within the next week, and also reported major items still in need of repair, including problems with the generator, the combined air conditioning and heating system, and with the running lights. When Hester told Kopel of the hull problems, however, Kopel informed him that he did not perform hullwork, but that Hester could leave the boat in his marina in the interim. Mr. Esch then promised that he would have someone look at the boat "as soon as possible."

About six weeks later, in mid-January of 1986, Esch called Hester to tell him that a Boatel mechanic had repaired the hull by replacing a cross member which had cracked approximately 16 feet back from the bow of the boat. Hester did not operate the boat again until early April, 1986. At this time, however, there were additional problems with the hull. In accord with Mr. Esch's request, Mr. Hester was transporting his boat from Kopel's boatyard to an Annapolis boat show when he encountered a storm producing 3–4 foot waves, and again heard a "crack-

ing" within the same general area of the hull as he had previously noted. Believing the structure of the boat to be in serious jeopardy, Hester returned to Kopel's and immediately notified Mr. Esch of the continued "cracking" in the boat. Esch offered that the Boatel representatives could examine the craft at the boat show, but by the time Hester was able to return to Annapolis, the representatives had left and consequently no repairs were made. Hester then left the boat at an Annapolis Marina.

Because it would be "awhile" before anyone from Boatel could inspect the boat, Hester, at Esch's suggestion, took the boat to another Annapolis boatyard, where two mechanics joined him on a "test ride" and gave their evaluation of the boat. Pursuant to this discussion, Hester ceased giving demonstration rides, but used the boat approximately 5–6 more times for "purely either personal or for business use" over the next 6 weeks. During this time, the "cracking" sound continued but Hester was told "that it probably just was some form of a mounting that was in the forward area of the capsule of the cabin.... I was assured that the boat could keep going, just don't take it out and beat it up." Hester was told that a Boatel official would see him by early summer.

On 7 June 1986, 278 days after taking delivery of the boat, Hester sent to Boatel and to Mr. Esch a 24–page letter itemizing 55 complaints with the boat. Of the approximately 14 items which remained in need of repair at that time, only one concerned the hull. Other major complaints included engine and generator malfunctions, problems with the combined air-conditioning and heating unit, and an excessive fuel consumption rate of approximately 37.9 gallons per hour as opposed to the advertised rate of only 20–22 gallons per hour.

Mr. Hester also remarked in the letter that he was now "a private boat owner" as far as the Maryland Department of Natural Resources was concerned. Mr. Esch and Mr. Hester had believed that Hester's incorporation of Bluewater Cruisers of Annapolis, Inc., would exempt Hester from

the Maryland 5% excise tax. On review of the transaction between these parties, however, the DNR and the taxing authorities determined this to be an ordinary trade sale, and required that the excise tax of $8,000 be paid.

Most significant were Hester's concluding remarks that: My incorporation of Bluewater Cruisers of Annapolis is now useless and as I was informed by the DNR, would not be recognized by the State under the *purpose for which it was intended.* Even more seriously, I cannot now write-off payments, insurance, repairs, gas and oil, the food, refreshments, promotion materials or *anything else* pertaining to my efforts on behalf of Bluewater.... [We] are major losers in this situation with a faulty boat, loss of income from commissions, credibility with those in his own business circle, a great deal of money and time. [emphasis added]

Hester offered Boatel "two options to rectify the situation." First, Boatel could reclaim the boat if it returned to the Hesters the original down payment, all payments he had made to the bank, lost commissions *"on at least 4 to 5 [boats],"* compensation for lost *commissions in the 1986–87 and 1987–88 seasons,* the cost of the "normally [pre]-installed" electrical equipment (which Hester himself purchased for the boat), costs for outside labor repairs and parts, insurance costs, the value of lost boating pleasure time, expenses for 16 trips and the cost of 81 boat slips (used in demonstrating the boat). The second option was that Boatel could deliver to the Hesters a new 1986–87 51 foot Bluewater Cruiser "equipped exactly as the existing model" for a price not to exceed $100,000 and Boatel would pay out the existing balance on the Hesters' loan.

Boatel rejected both options but countered with two proposals of its own. The first was that Boatel would repair all items about which Mr. Hester had complained—including the hull problem—which did not require actual redesign of portions of the boat. The Hesters rejected this proposal, however, because they did not desire to keep the boat. Boatel's second proposal, to take back the Hesters' boat,

refund their purchase price, and sell them a new boat, was also rejected.

In the meantime, based on continued assurances that something would be done about the problem, Mr. Hester, on the 4th of July weekend, 1986, took a group of friends out on the boat. One of the individuals on board told Hester that he had a "serious hull problem" and that he should get the boat out of the water as soon as possible. Mr. Hester did so four days later. Boatel informed him that it would send its representatives to address the problem "before July is over." At that point, Hester retained a marine surveyor, John Horan, to provide a written evaluation of the boat. Based on that report, Mr. Hester obtained an attorney.

Boatel states that at this point, the company had decided to take back the Hesters' boat and refund the purchase price. Before such offer was communicated, however, Hester's attorney, by letter of 24 July 1986, informed the President of Boatel of Hester's "notice of revocation for reasons set forth in Mr. Hester's letter as well as Mr. Horan's survey." The letter also extended an offer to enter into a mutual release of Boatel and Bluewater Cruisers if the former would agree to repay Mr. Hester for 12 specific items representing substantial expenses incurred by him since purchasing the boat. Boatel refused and on 23 October 1987, Hester's suit in the circuit court ensued, resulting in the judgments aforementioned. On appeal from those judgments, Boatel raises four arguments:

1—Boatel's limited warranty excluded all other warranties—express and implied, limited the Hesters' remedy to repair or replacement of defective parts, and precluded the Hesters from obtaining consequential damages.

2—Since the Hesters only sustained economic loss, the negligent misrepresentation claim should not have gone to the jury, or alternatively, the Hesters' recovery should have been limited to the reasonable cost of repairs.

3—It was reversible error to (a) refuse to admit evidence of the Hesters' financial condition as it related to motive; and (b) admit into evidence a letter written by Boatel in June, 1984 to a prospective customer when there was no evidence the Hesters had relied on this letter in purchasing their boat more than a year later, and

4—Executive services was not entitled to indemnification for attorney's fees from Boatel when there was no finding that Executive Services was liable to the Hesters and no loss had been sustained by Executive Services.

## I

We consider the first and third issues together.

The evidence disclosed that Boatel did in fact communicate express and implied warranties to the Hesters, and that these warranties were breached. We hold, however, that in light of the extensive business arrangement between the Hesters and Boatel, the Hesters were not "consumers" under the pertinent statutory definitions. Consequently, they were subject to Boatel's Limited Warranty, and were not entitled to return the boat, or collect damages for the value of the boat, at least until Boatel is given the opportunity to repair or replace the defects as provided in the Limited Warranty.

### A. *Boatel Communicated, and Breached, Express and Implied Warranties*

The severe structural problems with this boat were well documented at trial. Virtually all of the experts gave extensive testimony detailing the inadequate design and major structural defects of the boat. Perhaps the most alarming testimony concerned the thinness of the fiberglass at locations in the hull and the bottom of the boat. Michael Kaufman, a naval architect, estimated that a boat of this size required an outer hull with a thickness of *at least* one quarter of an inch to be considered safe. The measure-

ments of Hester's boat, however, showed a thickness of only one eighth of an inch—half the "minimal" amount. He found that the structural members were not end-connected in a number of places, that there was no proper web frame in the structure near the engines, and that "because of the engines and the engine torque . . . you will eventually get through the flexing of the thin bottom, you're going to get a failure around these points." Mr. Kaufman opined that "[t]he thickness of that bottom plating probably would have scared the snot out of me to run that thing in any kind of seaway. . . ." He concluded that "the structure itself was inadequate. The skin is too thin—and the stiffening members are deficient. Too weak, if you like." Kaufman considered the boat unsafe for operation on the Chesapeake Bay.

Mr. John Horan, the marine surveyor, found "alarming deflections" in the hull of the boat. He "observed that a secondary bond had fractured in the port bow area adjacent a hanging locker area" and ". . . also identified fiberglass fractures on bonds just forward of the engines on both port and starboard sides." Considering the "structural apparent inadequacies of the water craft," Mr. Horan recommended that Mr. Hester see a naval architect for an opinion as to the seaworthiness of the craft.

Another marine surveyor, Robert Skord, found "grave structural concerns" in two areas of the boat:

Number one was the actual hull shell itself, the skin of the boat, it had—had abnormal panel deflection to it. I could actually flex or oil can the hull shell with my hand. The other area was in the internal structural members, the plywood bulkheads, floor timbers, internal girders or strainers. . . . They—the attachments between the hull shell itself and those internal structural members was [sic] failing, there were several breaks or areas that were in the process of breaking, one had been previously repaired. In the girder systems themselves . . . there

were discontinuities.... There didn't appear to be any forethought to the way that they were installed.[2]

█ It is undisputable from the record that the Hesters did not get "the boat they bargained for." They got a "lemon." The relevant question concerns precisely what warranties—express or implied—were actually made to the Hesters. In presenting their argument for breach of warranty at trial, the Hesters relied, in part, on representations made in an 11 June 1984, letter from David B. Carse, Boatel's Vice–President of Sales and Marketing, to a potential customer. The letter, which was shown to Hester as part of Boatel's promotional package, contained extensive representations as to "the construction, warranty, and seaworthiness of the BOATEL CRUISER." It also specifically described the nine layers of material comprising the hull of the 1984 Cruiser. At trial, witnesses for Hester criticized these representations, stating that some of these layers were simply missing and that, in general, the hull was not as sturdy as it was advertised to be.

Boatel contends that the Hesters had no right to rely on warranties made in this letter because it was not specifically intended for them, and because it was written with regard to the previous year's model. We disagree. Hester testified that the letter had been among the materials which Mr. Esch used in promoting the boat to Mr. Hester. Since Boatel obviously used the letter as part of its promotional efforts, the jury could reasonably have found that Hester had relied on it.

Moreover, Hester clearly was justified in relying on a number of other promotional materials regarding the seaworthiness of the vessel. Several of the Bluewater "newsletters" produced at trial characterize the Bluewater line as

---

2. In fact, testimony at trial revealed that there was actually no specific design for the boat, but that it was the product of an "evolution" of ideas during its construction. Before the company had recently began manufacturing the Boatel Cruisers, Boatel's "bread and butter" had been pontoon and full-hull houseboats.

an "extraordinarily strong craft" and some materials specifically state that the boat is sturdy enough for beaching. It obviously was not.

■ Finally, the fact of Bluewater's selling the boat to Mr. Hester with the understanding that he would demonstrate it on the Chesapeake Bay was certainly sufficient to constitute an implied warranty that the boat was sturdy enough for safe operation on the Chesapeake Bay. It obviously failed to meet this warranty as well.

B. *The Hesters were not Consumers and therefore their Remedies under Count I (Revocation of Acceptance) and Count II (Breach of Warranty) are subject to Boatel's Limited Warranty*

Since Boatel clearly did breach warranties made to the Hesters, we must consider whether Boatel had effectively limited these warranties. Central to the decision on this issue is the question of whether the Hesters were consumers. In fact, the Hesters' argument that they had the right to revoke the contract is completely reliant on the premise that the Hesters' yacht was a "consumer good" under the applicable statutes, and therefore that the warrantor did not have the right to "negate or limit" its express or implied warranty. Similarly, appellant Boatel concedes that "if the boat at issue in this case was a 'consumer good' ... the Hesters [would] be permitted to ignore the Boatel's limited warranty limiting their recovery...." We hold that Mr. Hester was not a "consumer" under any of the Maryland statutes which he cites and that, although he may have fit within the definition of "consumer" under the Magnuson–Moss (Federal) statute, he is still foreclosed from recovery under that Act since it does not apply to purchases for resale. We begin with the Maryland statutes.

(i) *Maryland's Uniform Commercial Code*

■ Under Maryland's adoption of the Uniform Commercial Code, the relevant test as to whether certain items are "consumer goods" is whether "they are used or bought for

use primarily for personal, family, or household purposes." Maryland Code (1975), § 9–109 of the Commercial Law Article. *See also* § 2–316.1. As stated in § 9–109, (1), (2), (3), and (4) the classification of goods is mutually exclusive, and therefore a good can fall into only *one* category at any given time—either consumer or non-consumer. *See McFadden v. Merc. Safe Dep. & Trust,* 260 Md. 601, 273 A.2d 198 (1971). The Maryland Commercial Law Article § 2–316 clearly allows warrantors, under certain circumstances, to exclude either express or implied warranties. In order to exclude or modify implied warranties of merchantability the language must mention merchantability and be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be in writing and conspicuous. § 2–316(2). All implied warranties may be excluded by "language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." § 2–316(3)(a). Finally, the warrantor may limit remedies for breach of warranty in a like manner. § 2–316(4). There is no dispute that the Boatel limited warranty, if applicable, did accomplish all of these ends.

Under Maryland's adoption of the Uniform Commercial Code, such limited warranties are effective only as to non-consumers. The pertinent subsections of § 2–316.1 state that:

> (2) Any oral or written language used by a seller of *consumer goods* and services, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, is unenforceable. . . .

> (3) Any oral or written language used by a manufacturer of *consumer goods,* which attempts to limit or modify a consumer's remedies for breach of the manufacturer's express warranties, is unenforceable, unless the manufacturer provides reasonable and expeditious means

of performing the warranty obligations. [emphasis added]

Citing these sections the Hesters contend that they were "consumers," were therefore "immune" to Boatel's "limited warranty," and may seek a typical contract remedy in the form of revocation of acceptance. The Hesters argue that they had "the intention of buying a pleasure boat" and that when they approached Esch, it was he who suggested the tax benefits of showing the boat to other potential Boatel customers. They decided to accept this plan "as a way to lower the purchase price on their pleasure craft, while their primary intent of personal use remained constant." They acknowledge their consideration that showing the boat "would potentially enable [them] to save on the transfer tax between Esch and the Hesters." In general, however, the Hesters maintain that "[t]hey intended to and did use [the boat] for their own personal benefit. As a sideline, they had hoped to gain some tax benefit for using the boat as one would use some mileage on an automobile and write it off as part of a business expense."

As previously stated, the test to determine whether goods are in fact "consumer goods" is whether "they are used or bought for use *primarily* for personal, family, or household purposes." Commercial Law Article, § 9–109 (emphasis added). In borderline cases, it is the primary use, *In re Bell*, 6 U.C.C.R.S. 740 (D.Colo.1969), or the most significant use, *In re Ware*, 59 B.R. 549 (N.D.Ohio 1986), to which the product is put which should be considered as determinative.

The record in the instant case provides no support for the assertion that Hester either bought or used the yacht primarily for personal, family, or household purposes. Rather, Hester's own testimony with regard to his initial purchase of the boat, as well as his subsequent use of the boat, establishes that he anticipated substantial business related benefits from his use of the boat. The record shows that the Hesters formed the corporation, "Bluewater Cruisers of Annapolis" for the specific purpose of lowering the cost of the boat to within their price range; the boat was

not only titled in the corporate name, but also initially licensed with dealer tags, saving the Hesters $8,000 in state excise taxes; on his written agreement with Mr. Esch, Hester stated that he and his corporation would "be long term successful sub-dealers" for Boatel and each year "sell the previous year's demonstrator at a profit and prior to the Annapolis Boat Show receive a new demonstrator"; at the 1985 Annapolis Boat Show, the Hesters showed their boat to 96 prospective buyers, and took prospective buyers out for demonstration rides almost every available weekend in the fall of 1985; significantly, in his June 7, 1986 letter to Boatel, Hester complained that as a result of being forced to resign as a subdealer, "I cannot now write-off payments, insurance, repairs, gas and oil, the food, refreshments, promotion materials, or *anything else* pertaining to my efforts on behalf of Bluewater ..." and additionally that he would suffer "loss of income from commissions, credibility with those in his own business circle, a great deal of money and time." Hester's own arguments discredit his position that he is a consumer.

### (ii) *Maryland's Consumer Protection Act*

■ Mr. Hester argues that even if he doesn't qualify as a "consumer" under Maryland's Commercial Code, he is still entitled to return the boat and receive a complete refund under two other Maryland consumer-oriented statutes. The first is the Maryland Consumer Protection Act. Maryland Code (1975, 1983 Repl. Vol., 1988 Cum.Supp) § 13–101 et seq. of the Commercial Law Article. Appellants focus on a subtitle of this Act, § 13–301 *et seq.*, which addresses unfair trade practices such as misstatements or misrepresentations, made directly to the consumer or by advertisement or telephone solicitation, concerning the quality and availability of goods and services or the expertise and affiliation of merchants. *Klein v. State,* 52 Md.App. 640, 452 A.2d 173 (1982), *cert. denied,* 295 Md. 440 (1983). The purpose of the Consumer Protection Act as a whole is to protect the consumer, § 13–102(b)(1), by setting minimum standards, § 13–103(a), and to restore an "undermined" public confi-

dence in merchants. § 13–102(b)(2). *See Comment,* "Maryland's Consumer Protection Act: A Private Cause of Action for Unfair or Deceptive Trade Practices." 38 Md.L. Rev. 733 (1979). The remedies available under the Act are civil and equitable, § 13–401 *et seq.* Section 13–411 provides for criminal penalties; violations may be punished as a misdemeanor.

 We hold, unfortunately for Mr. Hester, that he is disqualified from recovering under this act for the same reason that he is under Maryland's Commercial Code; once again he does not qualify as a "consumer." The subtitle delineating deceptive trade or unfair practices clearly states that its remedies are limited to "consumers" purchasing "consumer goods." The meaning of these two critical terms, as defined under the Consumer Protection Act, § 13–101 are:

(c) ... "Consumer" means an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit.

(d) ... "[C]onsumer goods," ... mean ... goods ... which are *primarily* for personal, household, family, or agricultural purposes. [emphasis added]

This concept of consumer goods under the Consumer Protection Act is, for all practical purposes, the same as that in § 9–109(1) of the Maryland Commercial Code, which states that:

Goods are

(1) "Consumer goods" if they are used or bought for use primarily for personal, family or household purposes....

As we have discussed, the Hesters use of the boat in this case does not qualify as "primarily" personal under the Maryland Commercial Code. Consequently, the only possible way in which the Maryland Consumer Protection Act could aid Mr. Hester would be if its use of the word "primary" had a substantially different meaning from that of the Maryland Commercial Code. We think it did not.

*Black's Law Dictionary* 621 (5th ed. 1983) defines "primary purpose" as "[t]hat which is first in intention, which is fundamental. The principal or fixed intention with which an act or course of conduct is undertaken."

▆ The primary source for determining the Legislature's intent is the language of the statute itself which should be construed according to its ordinary and natural import. *Ryder Truck Lines v. Kennedy*, 296 Md. 528, 463 A.2d 850 (1983). "[W]here the statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, no construction or clarification is needed or permitted." *Comptroller v. Fairchild Industries*, 303 Md. 280, 284, 493 A.2d 341, 343 (1985). While this "plain meaning" rule is not absolutely rigid, *Kaczorowski v. City of Baltimore*, 309 Md. 505, 525 A.2d 628 (1987), we should avoid a statutory construction which is unreasonable, illogical, or inconsistent with common sense. *Fairchild, supra,* 303 Md. at 288, 493 A.2d at 345 (*citing State v. Intercontinental, Ltd.*, 302 Md. 132, 486 A.2d 174 (1985)).

Using these standards, the word "primary" has the same meaning under the Consumer Protection Act as under the Maryland Commercial Code. Both exist for the purpose of protecting the consumer—and are less concerned with protecting businessmen such as Mr. Hester.

(iii) *The Maryland Consumer Products Guaranty Act*

▆ The final Maryland statute cited by Mr. Hester is the Consumer Products Guaranty Act. Maryland Code (1975, 1983 Repl. Vol., 1988 Cum.Supp.) § 14–401, *et seq.* of the Commercial Law Article. This act discusses the duties of a guarantor with regard to guarantees made, remedies for wrongful breach of those guarantees, and defenses available to the guarantor. While appellee specifically cites this statute, he fails to explain why he is entitled to recover under it. The apparent reason is because the Act simply does not help him.

Under § 14–401 of the Act:

(d) ... "Guaranty" means ... [representations] which [are] made at the time of the sale of a *consumer product*

by a guarantor to a person guaranteed and which [are] part of the basis of the bargain between them.... [emphasis added]

### (iv) *The Magnuson–Moss Warranty Act*

■ The final statute relied on by the appellees is a federal consumer protection oriented statute, the Magnuson–Moss Warranty Act. 15 U.S.C. § 2301 et seq. The Act does indeed define "consumer product", in a significantly different way than do the Maryland statutes, focusing on what would be the *typical* use of a product, rather than the way in which a particular individual uses it. Under the provisions of the Act:

> The term "consumer product" means any tangible personal property which is distributed in commerce and which is *normally* used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed). [emphasis added]

15 U.S.C. § 2301(1).

The broad scope of the Act is explained in 16 C.F.R. § 700.1:

> (a) The Act applies to written warranties on tangible personal property which is normally used for personal, family, or household purposes.... This means that a product is a "consumer product" if the use of that type of product is not uncommon.... Where it is unclear whether a particular product is covered under the definition of consumer product, any ambiguity will be resolved in favor of coverage.

Appellees' boat does appear to qualify as a "consumer product" under this much more expansive definition. Unfortunately for Mr. Hester, while the broader terms of the Act may qualify the boat within the definition of "consumer product," they clearly exclude Mr. Hester as a "non-consumer." Under the Act,

[t]he term "consumer" means a buyer (*other than for purposes of resale* ) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled· by the terms of such warranty (or service contract).... [emphasis added]

15 U.S.C. § 2301(3).

While the Act requires only that the goods are *normally* used for personal purposes, it nevertheless will not aid individuals purchasing such goods for *resale*, which Mr. Hester clearly did. The courts have interpreted this "resale" provision strictly. In *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 657 P.2d 517 (1983), where a car dealer sought to invoke the Magnuson–Moss Act with regard to a wholesaler of cars, the court said:

As a retailer buying consumer products for resale from the manufacturer, Schmid is not within the definition of consumer as it is used in the Magnuson–Moss Federal Warranty Act....

*Id.* 657 P.2d at 532. A more recent case expressly stated that the Magnuson–Moss Act "does not apply where the buyer has purchased the consumer product for the purposes of resale," and noted that whether anyone actually ultimately purchases from the buyer is "irrelevant." *Najran Co. v. Fleetwood Enterprises, Inc.*, 659 F.Supp. 1081, 1100 n. 13 (S.D.Ga.1986).

Under this standard, there is no question that Hester purchased the boat "for resale." When he bought the boat, he signed an agreement stating that he and his wife would be

long term successful sub-dealers for Bluewater. *Each year they would sell the previous year's demonstrator at a profit and prior to the Annapolis Boat Show receive a new demonstrator.* [emphasis added]

Hester *intended* to *resell* the boat every year at a profit and this was all that was necessary to exclude him from the provisions of the Magnuson–Moss Warranty Act.

Because the Hesters are not "consumers" as defined in the Magnuson–Moss Warranty Act, and the boat is not "consumer goods" under any of the relevant state statutes, their right to recover is restricted to the Limited Warranty, and they may not recover consequential damages and attorney's fees under either Count I or Count II.

## II

Count III (misrepresentation) also was based on the premise that the Hesters were consumers. The amended complaint alleged that such misrepresentations violated Maryland Commercial Law Code Ann. §§ 13–301 et seq. (Unfair or Deceptive Trade Practices) and 15 U.S.C. § 2301 et seq. (The Magnuson–Moss Warranty Act). The court's instructions to the jury as to that count discussed misrepresentations deceiving or misleading *consumers*. As we have said, there was no evidence to support a finding that the Hesters were consumers as defined in those acts and, therefore, those acts cannot support their claim of negligent misrepresentation.

Because the Hesters suffered no physical injuries, their alleged damages being entirely economic losses, it would appear that they are likewise precluded from recovery for common law negligent misrepresentation. *Flow Industries, Inc. v. Fields Const. Co.*, 683 F.Supp. 527, 530 (D.Md.1988); *Wood Products, Inc. v. CMI Corp.*, 651 F.Supp. 641 (D.Md.1986); *Copiers Typewriters Calculators v. Toshiba Corp.*, 576 F.Supp. 312 (D.Md.1983).

A pervasive statutory scheme governs warranty claims in product liability cases, and it appears inappropriate to extend theories of negligent misrepresentation into an area where the Maryland General Assembly has carefully determined who may assert what claims against whom.

*Wood Products, supra*, 651 F.Supp. at 648.

In cases not involving products liability, personal injuries are not a necessary element of a cause of action

for negligent misrepresentation. *See Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988), and cases there cited. Likewise, in suits against contractors, developers and architects for *negligent design and construction,* presenting a clear danger of death or personal injury, the claim need not await the happening of a personal tragedy. *Council of Co-Owners v. Whiting-Turner,* 308 Md. 18, 517 A.2d 336 (1986).

> We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting the dangerous condition.

*Id.* 308 Md. at 35, 517 A.2d at 345.

Boatel's product in this case was alleged and proven to the satisfaction of the jury to be "neither safe nor seaworthy," creating a risk of death or personal injury. This does not require the extension of the rule in *Whiting-Turner* to cases of *negligent misrepresentation* in products warranty cases, however, since the damages recoverable—the reasonable cost of correcting the dangerous condition—are included within the damages recoverable under the warranty counts. We think that Count III should not have been submitted to the jury.

### III

*The Claim of Executive Services, Inc., for Attorneys' Fees*

 The Hesters filed suit against Boatel Industries, Inc., and Executive Services, Ltd., seeking to hold both liable, jointly and severally, on all counts. In its cross-claim filed against Boatel, Executive alleged that any warranties it may have made to the plaintiffs were based exclusively on representations made to Executive by Boatel, and that any defects in the boat were caused solely by Boatel. Executive, therefore, demanded judgment,

dismissing the Complaint of the Plaintiffs herein, together with costs and reasonable attorney's fees, or, *in the event that a verdict is recovered against it by the Plaintiffs, that it have judgment over* and against the Defendant/Cross–Defendant, Boatel Industries, Inc., for the same amount, together with costs and reasonable attorney's fees. [emphasis added]

The relief prayed was in the alternative: (1) that the complaint be dismissed, with costs and counsel fees assessed against the Hesters, or (2) indemnification or contribution from Boatel for any judgment recovered by the Hesters against Executive, including costs and counsel fees.

At the conclusion of the evidence, the trial court granted Executive's motion for judgment on the cross-claim, stating "any judgment that's entered against ... Executive Services, would be then passed on to Boatel." There was, however, no judgment entered against Executive. Judgment was entered for Executive. In the absence of an indemnity agreement between Boatel and Executive, and none has even been alleged, or some rationale for applying the rules governing contribution or indemnification among joint tortfeasors, which first requires a determination that Executive is liable to the Hesters, we are aware of no authority for the award of attorney's fees to Executive. In its brief, Executive asserts it is entitled to such fees "under the common law of indemnity," citing 41 Am.Jur.2d *Indemnity* § 2 (1968), which states, in part:

[A] right of indemnity has been said to exist whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, *as where one person is exposed to liability by the wrongful act of another in which he does not join.* [emphasis in Executive's brief]

The rationale of this principle is that if Executive is forced to defend an action based *solely* on alleged wrongdoing of Boatel, equity requires that Boatel bear the cost of that defense. *See C. & O.C. Co. v. County Comm'rs*, 57

Md. 201, 40 A. 430 (1881). Completely aside from the fact that this was not the theory asserted in the cross-claim, which was in the nature of a claim for contribution from a joint tort-feasor, the facts of this case do not support the present theory. Despite the granting of judgment in favor of Executive, the allegations in the suit of the Hesters were that Executive, as well as Boatel, had made various warranties and misrepresentations to the Hesters. Executive defended the charges of its own alleged wrongdoing, not those against Boatel, which provided its own defense.

■ As a general rule, legal fees incurred by the successful party are not recoverable. *Colonial Carpets v. Carpet Fair*, 36 Md.App. 583, 374 A.2d 419 (1977). We see nothing in this case justifying an exception to that general rule.

JUDGMENT FOR JAMES N. HESTER ET AL. AGAINST BOATEL INDUSTRIES, INC., AFFIRMED AS TO LIABILITY AND REVERSED AS TO DAMAGES; CASE REMANDED FOR NEW TRIAL ON DAMAGES ONLY; JUDGMENTS FOR ATTORNEYS' FEES REVERSED; COSTS OF THIS APPEAL TO BE PAID ONE-FOURTH BY BOATEL INDUSTRIES, INC., ONE-FOURTH BY EXECUTIVE SERVICES, LTD., AND ONE-HALF BY JAMES N. HESTER, SHARON E. HESTER AND BLUEWATER CRUISERS OF ANNAPOLIS, INC.