FARE DEALS, LTD., Plaintiff,

v.

WORLD CHOICE TRAVEL.COM,
INC., et al., Defendants.

No. CIV.A.S–01–1825.

United States District Court,
D. Maryland.
Northern Division.

Nov. 20, 2001.

Richard William Winelander, Baltimore, MD, for Plaintiff.

Thomas S. Hood, Law Office, Towson, MD, Mark Andrew Goodin, Morgan Lewis and Bockius LLP, Washington, DC, Howard M. Neu, Law Office of Howard M. Neu PA, Pembroke Pines, FL, Mark A. Miller, Baker Botts LLP, Washington, DC, Van H. Beckwith, Tyler L. Murray, Baker Botts LLP, Dallas, TX, Defendants.

## MEMORANDUM OPINION

SMALKIN, Chief Judge.

This matter comes before the Court on a motion to dismiss for failure to state a claim upon which relief can be granted, filed by the defendant Hotel Reservations Network, Inc. ("HRN"), and a motion to dismiss, or, in the alternative, for summary judgment, filed by the defendant Cimo, Inc., d/b/a Hotwire ("Hotwire"). Both defendants are incorporated under the laws of Delaware. The plaintiff, Fare Deals, Ltd. ("Fare Deals"), a Maryland corporation, is seeking relief for the misuse of its name via the internet web site <faredeals.com>, whose domain name is registered to another defendant, NetHoldings.com, Inc. ("NetHoldings"). The issues have been well briefed by the parties, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

### BACKGROUND

Fare Deals has been providing travel services in Maryland since 1990, primarily by arranging transportation reservations and tours for its customers. From the beginning, it has used the "Fare Deals" mark in connection with its business. In September 1993, Fare Deals applied for federal registration of the service mark "Fare Deals Ltd." with the United States Patent and Trademark Office. That Office approved the mark on March 30, 2001, and the registration ultimately issued on July 17, 2001.

Some time in 1996, Fare Deals began to develop an interactive web site to promote its business but soon discovered that the domain name <faredeals.com> had already been registered to a C.K. Solutions, a Canadian company. Consequently, Fare Deals set up its web site at <fare-deal.com>. At some point prior to April 2000, defendant Ricardo Barnes ("Mr. Barnes") became the registered owner of the domain name <faredeals.com>. In April 2000, Mr. Barnes in turn transferred the registration to BSB Trade and Technology Ltd., a corporation with offices in Beijing, China. Somewhat later, Mr. Barnes entered into an agreement with defendant Harvey Kaplan ("Mr.Kaplan") to use the <faredeals.com> domain name to sell on-line travel services through a

new entity, defendant NetHoldings. The <faredeals.com> domain name was transferred to NetHoldings and, in April 2001, Fare Deals alleges that Messrs. Barnes and Kaplan, NetHoldings, and Hotwire developed and launched the web site <faredeals.com>. Via a Hotwire banner ad posted on the site and linked to Hotwire's web site, customers could make airline reservations and purchase airline tickets from Hotwire.

Learning from a confused customer about the <faredeals.com> site, on May 2, 2001, Fare Deals sent a letter to Hotwire under the mistaken impression that Hotwire was the registered owner of the <faredeals.com> domain name and demanded that Hotwire discontinue use of the site. Upon receipt of Fare Deals' letter, counsel to Hotwire contacted Fare Deals' attorney by telephone, asserted that Hotwire was not the registered owner of the domain name, and asked whether the posting of a disclaimer would settle Fare Deals' complaints. Soon thereafter, a disclaimer appeared on the <faredeals.com> web site, clarifying the site's lack of connection with Fare Deals. Hotwire, however, never required the owners or operators of the <faredeals.com> site to post such a disclaimer. By letter dated May 9, 2001, Fare Deals demanded that Hotwire cease and desist use of the "Fare Deals" mark.

Several days later, NetHoldings and Messrs. Barnes and Kaplan launched a new version of the <faredeals.com> web site. This expanded site allowed customers to link not only to Hotwire, but also to HRN's web site, where customers could book hotel reservations. On June 13, 2001, after discovering the new site and its links, Fare Deals sent a cease and desist letter, similar to the letter it had sent Hotwire, to HRN. In response, HRN, by letter dated June 18, 2001, denied that it was using Fare Deals' mark, indicated that it neither owned nor controlled the <faredeals.com> web site, but promised to forward Fare Deals' complaint to the operators of the allegedly infringing site.

According to Fare Deals' complaint, HRN, Hotwire, NetHoldings, and Messrs. Barnes and Kaplan, pursuant to an agreement, would divide up the proceeds of sales made at the HRN and Hotwire web sites. The agreement to which Fare Deals refers is the standard affiliate agreement of HRN and Hotwire, whose relevant terms will be examined in due course.

Both HRN and Hotwire market the travel services that they sell on their web sites by making advertisements, in the form of banner ads or links, available to owners of independent internet web sites, who may post them on their own sites after accepting the terms of HRN's or Hotwire's affiliate agreements. Under both HRN's and Hotwire's agreements, participating affiliates are paid a commission every time customers at affiliate web sites follow the posted links from the affiliate sites to HRN's or Hotwire's site and complete a purchase transaction with HRN or Hotwire. In order both to enable affiliates to create the links and to track sales originating from individual affiliates, HRN and Hotwire provide each of their affiliates with a unique universal resource locater ("URL"). By reviewing usage of the unique URLs, HRN and Hotwire can then calculate the commissions due each affiliate.

Indeed, in January 2001, Mr. Kaplan, on behalf of NetHoldings, submitted an online application with respect to the web site <discounttrip.com> to become an affiliate of HRN. HRN approved the application and assigned a unique URL to <discounttrip.com>, which became an HRN affiliate the same month. Although HRN denies that Mr. Kaplan or NetHoldings ever submitted an application for the <far-

edeals.com> site, the Court will nevertheless assume, as it must for purposes of HRN's instant motion to dismiss, that a valid affiliate agreement existed between HRN and <faredeals.com>. Also in early 2001, Mr. Kaplan submitted an affiliate application to Hotwire with respect to the web site <economyreservations.com>. Hotwire approved the application and provided <economyreservations.com> with a unique URL; in March 2001, <economyreservations.com> became a Hotwire affiliate. However, neither Mr. Kaplan nor NetHoldings ever submitted an application to Hotwire with respect to the <faredeals.com> web site. Accordingly, Hotwire maintains no agreement of any sort with the <faredeals.com> site. Nevertheless, inasmuch as <faredeals.com> was in fact linked to Hotwire, it would appear that Mr. Kaplan (or someone else) copied the unique URL assigned to <economyreservations.com> to create a link from the <faredeals.com> site to Hotwire.

On June 22, 2001, Fare Deals filed the present nine-count action against Messrs. Barnes and Kaplan, NetHoldings, Hotwire, and others, alleging federal and state-law claims for relief, to wit: Count I-cyberpiracy under the federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); Count II-federal false designation of origin under 15 U.S.C. § 1125(a); Count III-federal trademark dilution by blurring under 15 U.S.C. § 1125(c); Count IV-federal trademark dilution by tarnishment under 15 U.S.C. § 1125(c); Count V-common-law unfair competition; Count VI-common-law trade disparagement; Count VII-tortious interference with economic relationships; Count VIII-civil conspiracy; and Count IX-deceptive trade practices

under the Maryland Consumer Protection Act, Md.Code Ann., Com. Law II § 13–408(a).[1] On June 29, 2001, this Court granted Fare Deals a temporary restraining order shutting down the <faredeals.com> web site. On July 9, 2001, Fare Deals filed an amended complaint adding HRN as a defendant.

## I. *DEFENDANT HRN*

### *STANDARD FOR MOTION TO DISMISS*

Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss under Rule 12(b)(6), a court must accept the allegations contained in the complaint as true. *See DeBauche v. Trani,* 191 F.3d 499, 505 (4th Cir.1999) (citing *Conley,* 355 U.S. at 47–48, 78 S.Ct. 99). The court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Otherwise, "Rule 12(b)(6) would serve no function, for its purpose is to provide a defendant with a mechanism for testing the legal sufficiency of the complaint." *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1086 (4th Cir.1979); *see also Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994) (reiterating that a plaintiff's legal conclu-

---

**1.** Fare Deals has also asserted, as a separate count, a request for injunctive relief. However, a request for injunctive relief does not constitute an independent cause of action; rather, the injunction is merely the remedy sought for the legal wrongs alleged in the nine substantive counts. *See Howell Petroleum Corp. v. Leben Oil Corp.,* 976 F.2d 614, 622 (10th Cir.1992).

sions merit no deference in deciding a motion to dismiss).

In addition to the factual allegations, the court may also consider any documents referred to in the complaint and relied upon to justify a cause of action-even if the documents are not attached as exhibits to the complaint. *See* Fed.R.Civ.P. 10(c); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1164 (4th Cir.1994) (citing *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991) (deeming a complaint "to include ... any statements or documents incorporated in it by reference" and permitting a defendant to produce such materials when attacking the complaint)). When the bare allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail. *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.1991).

In bringing its action, Fare Deals has referred to and relied upon its correspondence with HRN and the affiliate agreement (the "Letter Agreement") between HRN and defendant NetHoldings. Although Fare Deals did not attach these documents to its complaint, HRN has attached them to its motion to dismiss. With due consideration given both to these documents and to the factual allegations of the complaint, it appears beyond doubt that Fare Deals can prove no set of facts sufficient to support any of its claims against HRN. This Court will therefore GRANT HRN's motion to dismiss all of Fare Deal's claims.

## ANALYSIS

### A. *Cyberpiracy*

■ Under the federal Anticybersquatting Consumer Protection Act ("ACPA"), Fare Deals cannot state a valid claim unless it can allege that HRN had "a bad faith intent to profit from" Fare Deal's mark and "register[ed], traffic[ked] in, or use[d]" an infringing domain name. 15 U.S.C. § 1125(d)(1)(A); *see also Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269–70 (4th Cir.2001) (engaging in a two-pronged inquiry under the ACPA into bad faith and use). "Use" has a statutorily defined meaning. The ACPA strictly limits liability for using a domain name to "the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D).

Fare Deals' claim here fails because it has not alleged any facts that suggest that HRN registered, trafficked in, or used the domain name <faredeals.com>. The bald allegation that HRN "trafficked in, used and/or licensed the domain name" does not make it so. "The presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support the legal conclusion." *Migdal v. Rowe Price–Fleming Int'l, Inc.*, 248 F.3d 321, 326 (4th Cir.2001) (citation and internal quotation marks omitted). Fare Deals has nowhere alleged that HRN participated in any way in the registration, ownership, or licensing of the domain name, or in the development, launching, or operation of the <faredeals.com> web site. HRN did license defendant NetHoldings to use HRN's own service marks; no one, however, ever licensed HRN to use the <faredeals.com> domain name.

### B. *Federal False Designation of Origin and Trademark Dilution*

To state a valid claim for false designation of origin under the Lanham Trade-Mark Act (the "Lanham Act"), the plaintiff must allege that the defendant "in connection with goods or services ... use[d] in

commerce" the plaintiff's mark in a manner likely to confuse consumers about the source or sponsorship of the goods or services. 15 U.S.C. § 1125(a)(1); *see also People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir.2001) (summarizing the elements of the cause of action). Similarly, to state a valid claim for trademark dilution under the Lanham Act, the plaintiff must allege that "another person's use in commerce of a mark or trade name ... [has] cause[d] dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1).

Just as the ACPA specifically defines "use," so the Lanham Act specifically defines "use in commerce." According to the statute, "use in commerce" means "the bona fide use of a mark in the ordinary course of trade." *Id.* § 1127. In the case of services, a mark is deemed to be used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce ...." *Id.*

Fare Deals has advanced three theories of liability under the Lanham Act: direct, vicarious, and contributory. The Court will address each in turn.

### 1. *Direct Liability*

■ Fare Deals' theory of direct liability fails because it has not alleged any facts that suggest that HRN used the "Fare Deals" mark in commerce. Nowhere does Fare Deals allege that HRN had any control over the registration, launch, or operation of the <faredeals.com> web site. Nor does Fare Deals allege that HRN used the Fare Deals mark on its own <hoteldiscount.com> web site or on any other web site owned and controlled by HRN. There is no allegation that HRN used the "Fare Deals" mark in any other literature, communications, or promotions of its services. A defendant cannot have used an infringing mark when it played no role in the act of placing the mark in commerce.

### 2. *Vicarious Liability*

■ The law of agency, in appropriate circumstances, renders a principal vicariously liable for the torts of its agent. *See, e.g., Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 565–66, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). A court may apply traditional rules of agency law to a federal statute's civil liability provision when those rules accord with the statute's purpose and when Congress has not indicated otherwise. *Thomas v. Ross & Hardies*, 9 F.Supp.2d 547, 557 (D.Md.1998). Because the Lanham Act's purpose of prohibiting unfair competition would go largely unrealized if it absolved principals from the trademark-infringing acts of their agents, and because the Act itself does not disavow such liability, a cause of action under the Lanham Act may lie vicariously against a principal.[2] *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1437 (3d Cir.1994).

---

**2.** Of course, the application of agency law to the Lanham Act raises the question which law to apply-the common law of the state where the infringing action took place or federal common law. *See W.T. Rogers Co. v. Keene*, 778 F.2d 334, 338 (7th Cir.1985) (recognizing that a court should apply the common law of the relevant state if the Lanham Act is interpreted as providing no more than "a federal remedy for unfair competition," but should apply the general principles of federal common law if the Act is interpreted as creating "a federal substantive law of unfair competition"). Nonetheless, in the present case, the resolution of this conundrum need not detain the Court, because Maryland law of agency does not deviate substantially from the principles of the common law applied by federal courts generally.

■ "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). The creation of an agency relationship ultimately turns on the parties' intentions as demonstrated either by express agreement or by inference from their actions. *Green v. H & R Block, Inc.,* 355 Md. 488, 503, 735 A.2d 1039 (1999). Courts applying Maryland agency law typically examine three factors in determining whether a principal-agent relationship exists: first, the principal's right to control the alleged agent; second, the alleged agent's duty to act primarily for the benefit of the principal; and, third, the alleged agent's power to alter the legal relations of the principal. *Id.* These factors provide guidance, but "[t]hey are neither exclusive nor conclusive considerations." *Id.* at 506, 735 A.2d 1039. The parties' intent controls, and a court must ascertain their intent "within the context of the entire circumstances of the transaction or relations." *Id.*

■ The party asserting the claim dependent upon an agency relationship bears the burden of proving its existence, including its nature and extent. *Id.* at 504, 735 A.2d 1039. The question of agency is a factual matter, and, if any legally sufficient evidence of an agency relationship is produced, it must be submitted to the factfinder. *Id.* On the other hand, if the party asserting a principal-agent relationship fails to produce sufficient evidence to allow a reasonable fact-finder to conclude that such a relationship exists, a court may grant summary judgment on the agency issue. *Id.* at 504–05, 735 A.2d 1039. Similarly, a court may dismiss a claim based on agency when it appears beyond doubt that the party making the claim alleges insufficient facts to support the existence of an agency relationship.

The only facts to which Fare Deals points to establish a principal-agent relationship between HRN and the owners and operators of the <faredeals.com> web site are the terms of the affiliate agreement between HRN and NetHoldings. The agreement, however, explicitly defines affiliates as independent contractors, disavowing any partnership or joint venture. Letter Agrm't at ¶ 18. And, although the substance of the parties' relationship, not the label they give it, determines the existence of agency, *see Cerniglia v. Pretty,* 674 F.Supp. 1167, 1170 (D.Md.1987), Fare Deals can adduce nothing in this case that oppugns the label.

Under the terms of the agreement, the control that HRN exercises over its affiliates is minimal. HRN has no power to monitor or supervise affiliate operations except to police their use of HRN's own service marks. Letter Agrm't at ¶ 10. Of course, a principal need not control the minutiae of an agent's actions; so long as the principal has "ultimate responsibility to control the end result of [its] agent's actions," an agency relationship may yet exist. *Green,* 355 Md. at 510, 735 A.2d 1039. HRN's affiliates, however, remain "solely responsible for the development, operation and maintenance of" their web sites and "for all materials that appear on" their web sites. Letter Agrm't at ¶ 11. Affiliates specifically agree to assume sole responsibility for ensuring that their web sites do not infringe the trademark rights of others. *Id.*

HRN's affiliates do have some duty to act for HRN's benefit. They agree to expend their "best efforts" to "promote hotel products" on their web sites, and they also agree to use HRN's hotel booking engine exclusively-an agreement NetHoldings appears to have breached. *Id.* at

¶ 5. Nevertheless, affiliates act otherwise primarily for their own benefit, not for the benefit of HRN, just as does a buyer of goods who has an exclusive dealing agreement yet is not his seller's agent. *Cf.* Md.Code Ann., Com. Law I § 2–306(2)(1997).

Further, HRN's affiliates have no power to alter the legal relations of HRN. They cannot bind HRN to any contract. Neither NetHoldings nor any affiliate has any authority to conduct or conclude a transaction on HRN's behalf. HRN retains exclusive authority to accept or reject the orders of customers who have accessed its booking engine via a link on an affiliate's web site. *Id.* at ¶ 7. The <faredeals.com> web site used linking to direct internet users to HRN's booking engine; HRN itself conducted all sales transactions; and, on all sales that HRN concluded, the owners of the <faredeals.com> site earned a commission. Fare Deals has alleged no more-and the sum of its allegations do not demonstrate any intent on the parts of HRN and NetHoldings or any other affiliate to enter into a principal-agent relationship.

Absent a principal-agent relationship between HRN and the owners or operators of the <faredeals.com> web site, HRN cannot be vicariously liable for their tortious acts. *See Gallagher's Estate v. Battle,* 209 Md. 592, 602, 122 A.2d 93 (1956) (acknowledging the existence of a principal-agent relationship as a necessary prerequisite to vicarious agency liability). The mere *ipse dixit* of Fare Deals that an agency relationship exists does not conjure one. *See Migdal,* 248 F.3d at 326 (warning that conclusory allegations, without more, indicate the absence of any factual basis for the complaint). Nor do the facts Fare Deals pleads suggest one.

### 3. *Contributory Liability*

■ Fare Deals first raised the theory of contributory liability in its opposition to HRN's motion to dismiss. HRN argues that the Court should not consider such a theory because a plaintiff may not amend its complaint in its opposition to a motion to dismiss. *See Zachair, Ltd. v. Driggs,* 965 F.Supp. 741, 748 n. 4 (D.Md.1997) (noting that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"); *see also Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) (discountenancing amendment of a complaint through arguments in opposition to a motion either for dismissal or summary judgment). The Court must therefore determine whether Fare Deals must move to amend its complaint before a claim for contributory infringement may be maintained.

■ A claim need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). A statement that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" suffices. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Whether the notice afforded the defendant is fair turns primarily on its factual content, not the legal theories that it might propound. *See Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 900 (4th Cir.1996). If the claim sets forth the circumstances, occurrences, and events that, if proved, would entitle the plaintiff to relief, that is enough. *Id.* In fact, the plaintiff "need not set forth any theory or demand any particular relief for the court will award appropriate relief if the plaintiff is entitled to it on any theory." *Id.* (citation and internal quotation marks omitted); *see also* Fed.R.Civ.P. 54(c) (dictating that "every final judgment

shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings").

■■■ If, however, the plaintiff's prosecution of the claim has "improperly and substantially prejudiced" the defendant, the plaintiff may not be "entitled" to the relief. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Although HRN contends that it would be unfairly prejudiced by allowing Fare Deals to "recharacterize" its claims, the Court disagrees. In the first place, Fare Deals has alleged that HRN and the other defendants have violated 15 U.S.C. § 1125(a). This section of the Lanham Act, which applies to both registered and unregistered marks, in conjunction with 15 U.S.C. § 1114, which applies only to registered marks, broadly proscribes trademark infringement. Both sections protect consumers from deceptive claims about the nature and origin of goods or services, and both protect mark owners from the misappropriation of their valuable intellectual property. *See Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148 (7th Cir.1992). Although neither section explicitly provides a cause of action for contributory infringement, courts have often invoked one or both sections as supporting contributory liability. *See, e.g., Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853–54, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (citing 15 U.S.C. § 1114 in support of claim of contributory infringement); *Hard Rock Cafe Licensing*

*Corp.*, 955 F.2d at 1148 (treating both 15 U.S.C. §§ 1114 and 1125(a) as encompassing contributory liability); *Med. Alert Found. U.S., Inc. v. Corel Corp.*, 43 F.Supp.2d 933, 939–40 (N.D.Ill.1999) (invoking both 15 U.S.C. §§ 1114 and 1125(a)).[3]

Secondly, both HRN and Hotwire have had an opportunity to respond to Fare Deal's contributory infringement theory in their reply memoranda. Admittedly, this single opportunity does not match the two opportunities they would have had if Fare Deals had raised the theory in its initial complaint; nevertheless, both HRN and Hotwire have advanced arguments on the merits, and no party has requested an opportunity for additional briefing. *See Nat'l Fed'n of the Blind, Inc. v. Loompanics Enters., Inc.*, 936 F.Supp. 1232, 1243–44 (D.Md.1996) (permitting plaintiff to raise theory of contributory infringement in its opposition to defendant's motion to dismiss because the defendant suffered no unfair prejudice).

For these reasons, Fare Deals need not move to amend its complaint to specifically state a claim for contributory infringement, and the Court now addresses directly Fare Deals' contributory liability theory.

■■■ Contributory infringement occurs in either of two circumstances: when the defendant intentionally induces a third party to infringe the plaintiff's mark, or when the defendant supplies a product to a third party, knowing that the third party is using the product to infringe the mark. *Inwood Labs., Inc.*, 456 U.S. at 854, 102

---

**3.** Defendant Hotwire points out that the Supreme Court approved contributory infringement liability in analyzing a claim solely under 15 U.S.C. § 1114 and cautions the Court not to expand any such implied liability to Fare Deals' claim under 15 U.S.C. § 1125(a). However, as *Hard Rock Cafe Licensing Corp.* indicates, the logic of contributory infringement liability applies equally to both infringe-

ment provisions of the Lanham Act. 955 F.2d at 1148; *see also* John T. Cross, *Contributory Infringement and Related Theories of Secondary Liability for Trademark Infringement*, 80 Iowa L.Rev. 101, 119–21 (1994) (endorsing contributory liability for the infringing behaviors prohibited by both sections, though concluding that such liability derives from the common law rather than the Lanham Act).

S.Ct. 2182. Fare Deals claims only the latter basis for contributory infringement and must therefore prove that HRN supplied a product to a direct infringer with actual or constructive knowledge that its product was being used to infringe the "Fare Deals" mark. For purposes of the pending motions, the Court will assume that the owners or operators of the <fare-deals.com> web site were infringing Fare Deals' mark.

Under the plain language of *Inwood Laboratories*, liability for contributory infringement depends on supply of a "product." 456 U.S. at 854, 102 S.Ct. 2182. The defendant in *Inwood Laboratories* manufactured generic pharmaceuticals that it distributed to non-party pharmacists, who packaged the drugs and mislabeled them with the plaintiff's name brand. *Id.* at 850, 102 S.Ct. 2182. The plaintiff stated a cause of action for contributory infringement by alleging that the defendant "continued to supply [the product] to pharmacists whom [the plaintiff] knew were mislabeling generic drugs." *Id.* at 855, 102 S.Ct. 2182.

The doctrine laid out in *Inwood Laboratories*, however, has not been confined to the manufacturer-distributor context. In *Hard Rock Cafe Licensing Corp.*, the Seventh Circuit held that a flea-market operator may be contributorily liable for the counterfeit T-shirt sales of one of its vendors. 955 F.2d at 1148–49. Recognizing that the *Inwood Laboratories* doctrine did not obviously apply to "people who do not actually manufacture or distribute the good that is ultimately palmed off," the court analogized the flea-market operator to a landlord, who is responsible "for the torts of those it permits on its premises 'knowing or having reason to know that [they are] acting or will act tortiously ....'" *Id.* (quoting Restatement (Second) of Torts § 877(c)(1979)). The court emphasized, too, that the flea-market operator was "not merely a landlord," but also "advertise[d] and promote[d] the activity on its premises, [sold] admission tickets to buyers and supervise[d] the premises." *Id.* at 1148. So relying on the principles of common-law tort liability to delimit the scope of *Inwood Laboratories'* holding, the court mused that a temporary help service furnishing the vendor with workers to erect his flea-market stand might not be contributorily liable, even if the help service knew that counterfeit goods would be sold there. *Id.*

The Ninth Circuit, endorsing the rationale of *Hard Rock Cafe*, held in *Fonovisa, Inc. v. Cherry Auction, Inc.*, that a flea-market operator could be found contributorily liable for trademark infringement if it continued to supply a marketplace to one of its vendors after learning that the vendor was selling counterfeit music recordings. 76 F.3d 259, 264–65 (9th Cir.1996). Observing that "it would be difficult for the infringing activity to take place ... without the support services provided by [the landlord] ... includ[ing] ... the provision of space, utilities, parking, advertising, plumbing, and customers," the court asserted such "material contribution" to the vendor's infringement would support a claim of contributory liability. *Id.* at 264.

More recently, the Ninth Circuit has considered the application of the *Hard Rock Cafe* rationale to a claim of contributory infringement on the internet. In *Lockheed Martin Corp. v. Network Solutions, Inc.*, the plaintiff owner of the registered service mark "Skunk Works" sued an internet domain name registrar and routing service provider under a contributory liability theory. 194 F.3d 980, 982–83 (9th Cir.1999). Lockheed founded its claim upon multiple registrations by unnamed parties of domain names similar or identical to its mark, including <skunk-

works.com> and <skunkworks.net>. *Id.* at 983. It argued that Network Solutions, Inc. ("NSI") was liable for the infringing activity solely on the second basis of *Inwood Laboratories*-supplying a product with knowledge of infringement. *Id.* The court affirmed summary judgment against Lockheed. *Id.* at 984.

In reaching its decision, the court suggested that *"Hard Rock* and *Fonovisa* teach ... that when measuring and weighing a fact pattern in the contributory infringement context without the convenient 'product' mold dealt with in *Inwood Lab[oratories]*," a court should "consider the extent of control exercised by the defendant over the third party's means of infringement." *Id. In fine,* "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark permits the expansion of *Inwood Lab[oratories]* ' 'supplies a product' requirement for contributory infringement." *Id.*

The court noted that the registration and routing services that NSI provided did not fit within the "product" mold, and also observed that NSI itself neither supplied the domain name combinations nor governed the use of the domain names by infringing registrants. *Id.* at 984–85 ("Where domain names are used to infringe, the infringement does not result from NSI's publication of the domain name list, but from the registrant's use of the name on a web site or other internet form of communication in connection with goods or services ...") (citation and internal quotation marks omitted). NSI's services, the court then determined, did "not entail the kind of direct control and monitoring required to justify an extension of the 'supplies a product' requirement." *Id.* at 985. The key distinction between the potentially infringing conduct in *Hard Rock Cafe* and *Fonovisa* and that of NSI lay in what the defendants were licensing.

While NSI merely licensed its routing service to domain name registrants, the defendants in *Hard Rock Cafe* and *Fonovisa* were licensing real estate, "with the consequent direct control over the activity that the third-party alleged infringers engaged in on the premises." *Id.* To find contributory liability in the absence of the kind of direct control vested in the landlord in a landlord-tenant relationship "would reach well beyond the contemplation of *Inwood Lab[oratories]* and its progeny." *Id.*

Like NSI in *Lockheed Martin,* HRN neither provided a product to the owners or operators of the <faredeals.com> web site nor directly controlled and monitored the site in a manner sufficient to justify expansion of the "supplies a product" requirement to include HRN's activity. HRN had no authority to control the operations of the <faredeals.com> web site. *See* Letter Agrm't at ¶¶ 10–11. HRN licensed no real estate; it merely licensed its own mark to the alleged direct infringer. However, a licensor of a mark does not ordinarily have a duty to prevent a licensee's misuse of another party's mark. *See Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.,* 967 F.2d 1516, 1520 (11th Cir. 1992) ("[To hold otherwise] would impose responsibility upon a [licensor] not for failing to maintain the integrity of its own trademark, but for failing to prevent another entity's violation of the law. We can discern no reason to impose such a burden upon a party that is, at best, secondarily responsible for any trademark infringement.").

Moreover, liability in the flea-market cases rested on more than the relatively passive degree of control and monitoring usually exercised by a landlord. The flea-market operators not only exercised considerable actual control over the operations of their vendors; they also actively supported the infringing businesses of

their vendors-by advertising and promoting the flea markets and by providing the vendors their customers. *See Hard Rock Cafe Licensing Corp.*, 955 F.2d at 1148; *Fonovisa, Inc.*, 76 F.3d at 264. HRN, however, has provided no such support: it neither steered customers toward <faredeals.com> nor advertised the <faredeals.com> site. Even assuming that a valid affiliate agreement had been executed, the nature of the license would contemplate internet traffic flowing *from* <faredeals.com> *toward* HRN-not the other way around. Further, the flea-market operators were providing the very medium through which the infringing vendors conducted their businesses. If the flea-market operators had stopped providing the vendors space, the vendors would have been forced to shut down completely. HRN, on the other hand, seems less like the flea-market operators and more like the temporary help service imagined by the *Hard Rock Cafe* court: just as infringing vendors could get workers anywhere to erect their booths, so the owners and operators of the <faredeals.com> web site could link to any number of internet travel-service providers. *See Hard Rock Cafe Licensing Corp.*, 955 F.2d at 1148. If HRN severed its link to <faredeals.com>, the infringement could readily continue.

Nevertheless, even if the facts suggested otherwise-that HRN might be contributorily liable because it "supplied a product" to the infringers or directly controlled and monitored the means of infringement, Fare Deals cannot demonstrate that HRN had the requisite knowledge of the infringing activity to find it liable under *Inwood Laboratories*. There are no facts advanced to show that HRN had any notice-actual or constructive-of any possible infringement prior to receipt of Fare Deals' June 13, 2001, demand letter. Therefore, HRN could, at most, be liable for contributory infringement during the sixteen-day period between June 13 and June 29, 2001,

when this Court granted a temporary restraining order shutting down the disputed web site.

The demand letter certainly gave HRN knowledge of Fare Deals' own position with respect to infringement by the <faredeals.com> site; it may also have given HRN reason to suspect it might be linked to a site infringing Fare Deals' mark and so have given rise to an obligation on the part of HRN to investigate the matter. *See Hard Rock Cafe Licensing Corp.*, 955 F.2d at 1149 (affirming that willful blindness amounts to knowledge for purposes of trademark infringement, and defining willful blindness as a deliberate failure to investigate suspected wrongdoing). The letter did not, however, obligate HRN to immediately terminate the link from the disputed web site. *Compare id.* (suggesting that flea-market operator, without knowing more, may not have been obligated to take action against vendor simply because it learned that the vendor was selling inexpensive T-shirts with cut labels) *with Fonovisa, Inc.*, 76 F.3d at 261 (finding that flea-market operator had sufficient knowledge of infringement and should have taken action when sheriff had raided the market, seized 38,000 counterfeit music recordings, and notified operator of on-going sales of infringing materials). In its June 18, 2001, response to the demand letter, HRN notified Fare Deals of its lack of control over affiliated web sites, and indicated that it would forward Fare Deals' complaint to the operators of <faredeals.com>. The issuance of the restraining order soon thereafter brought to a halt whatever further action or investigation HRN might have undertaken.

Nor is it clear what an investigation by HRN could have uncovered. HRN could, of course, have examined the <faredeals.com> site itself. Its autopsy, however, would have disclosed no more than that

the site's domain name was indeed <fare-deals.com>. It would not, self-evidently, have disclosed any infringement of the "Fare Deals" mark, which was, as yet, unregistered. The infringement at issue is not so transparent-even to the legally adept-as handbags labeled Louis Vuitton and Gucci, cheaply made, lined with purple vinyl, and sold by itinerant peddlers at bargain-basement prices. *See Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989).

Under the circumstances, sixteen or fewer days of inchoate suspicion-engendered solely by the allegations in Fare Deals' demand letter-cannot as a matter of law be deemed willful blindness to the infringement of Fare Deals' mark. HRN therefore lacks the knowledge required to prove contributory infringement.

### C. *Common–Law Unfair Competition and Trade Disparagement*

The Maryland common law governing Fare Deals' claims of unfair competition and trade disparagement generally track federal statutory law under 15 U.S.C. § 1125(a)(1). *See HQM, Ltd. v. Hatfield*, 71 F.Supp.2d 500, 504–05 & n. 17 (D.Md. 1999) (dismissing federal statutory and Maryland common-law claims together and applying the same analysis to both). Because Fare Deals has not argued any relevant distinction between state and federal law, its claims against HRN under Maryland common law must fail for the same reasons its claims under the Lanham Act fail.

### D. *Tortious Interference*

■ To state a valid claim under Maryland law for tortious interference with economic relationships, the plaintiff must plead facts-rather than bare legal conclusions-establishing: (1) that the defendant has committed intentional and willful acts; (2) calculated to cause damage to the plaintiff in its lawful business; (3) done with the

unlawful purpose of causing such damage, without right or justification; and (4) that actual damage has resulted from those acts. *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 336 Md. 635, 652, 650 A.2d 260 (1994). The plaintiff must establish "both a tortious intent and improper or wrongful conduct." *Id.* at 656, 650 A.2d 260 (citation and internal quotation marks omitted); *see also Mates v. N. Am. Vaccine, Inc.*, 53 F.Supp.2d 814, 828–29 (D.Md.1999) (dismissing claim of tortious interference when plaintiff failed to allege "conduct that is independently wrongful or unlawful"). Moreover, it is insufficient to allege malicious intent generally: the plaintiff must show that the defendant specifically intended to interfere with its business relations; mere "incidental" interference the law takes no cognizance of. *K & K Management, Inc. v. Lee*, 316 Md. 137, 158–63, 557 A.2d 965 (1989).

■ Fare Deals has failed to allege any specific facts that HRN maliciously intended to damage Fare Deals' business relationships with others. The sole malicious action Fare Deals alleges HRN undertook was to enter into an agreement to license *its own* mark for use by affiliates, pursuant to its standard agreement. Yet the terms of that agreement belie any malicious intent. With respect to any affiliate, the nonexclusive licensing agreement advances HRN's legitimate business interests. *See Alexander & Alexander, Inc.*, 336 Md. at 654, 650 A.2d 260 (observing that "acting to pursue one's own business interests at the expense of others is not, in itself, tortious"). Further, the agreement affirmatively requires each affiliate to ensure that it will not interfere with the rights of others. Letter Agrm't at ¶ 11. Accordingly, Fare Deals' claim of tortious interference cannot stand.

## E. *Civil Conspiracy*

■ In Maryland, civil conspiracy cannot stand as an independent cause of action. A defendant's liability for civil conspiracy depends entirely on its liability for a substantive tort. *See Alleco Inc. v. Harry & Jeanette Weinberg Found.*, 340 Md. 176, 189–90, 665 A.2d 1038 (1995) (affirming dismissal of claims for conspiracy to breach fiduciary duty and to defraud on ground that allegations of underlying torts were insufficient). Because Fare Deals has failed to demonstrate any liability of HRN for a substantive tort, its claim of civil conspiracy has no merit and must also be dismissed.

## F. *The Maryland Consumer Protection Act*

■ The Maryland Consumer Protection Act ("CPA") purposes "to provide minimum standards for the protection of consumers." Md.Code Ann., Comm. Law II § 13–103(a)(2000). The CPA prohibits certain unfair and deceptive trade practices "in [t]he sale ... of any consumer goods ... or consumer services" or in "[t]he offer for sale ... of consumer goods ... or consumer services," *id.* § 13–303, and it authorizes private causes of action against violators, *id.* § 13–408(a). Such causes of action, however, are limited to "consumers" purchasing "consumer" goods or services. *See Boatel Indus. v. Hester*, 77 Md.App. 284, 303, 550 A.2d 389 (1988); *see also Penn–Plax, Inc. v. L. Schultz, Inc.*, 988 F.Supp. 906, 909–11 (D.Md.1997) (canvassing Maryland cases, observing that three federal courts, in reliance on those cases, have held that only consumers have standing under the CPA, and finally asserting that "there is no competitor standing under the CPA"). The CPA defines "consumers" as purchasers or recipients of "consumer" goods or services, "which are primarily for personal, household, family, or agricultural purposes." Md.Code Ann., Comm. Law II § 13–101(c), (d).

Quite simply, Fare Deals, a corporate commercial entity, is not a "consumer" under the Maryland Consumer Protection Act. Therefore, the CPA affords it no protection and no remedy. *See Boatel Indus.*, 77 Md.App. at 302–04, 550 A.2d 389 (holding that plaintiff who purchased boat for commercial purposes had no cause of action under the Act because he was not a consumer).

## II. *DEFENDANT HOTWIRE*

In bringing its claims against Hotwire, Fare Deals has alleged that Hotwire developed and launched the <faredeals.com> web site in conjunction with NetHoldings and other defendants. Hotwire has refuted this allegation by affidavit and other exhibits attached to its motion to dismiss or, in the alternative, for summary judgment. Expressly recognizing that Hotwire's motion might be treated as one for summary judgment, Fare Deals incorporated its own affidavits and exhibits in its opposition.

■ When "matters outside the pleadings are presented to and not excluded by the court, [a 12(b)(6) ] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R.Civ.P. 12(b). The requirement of "reasonable opportunity" means that all parties must be given "some indication by the court ... that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits and pursue reasonable discovery." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir.1985) (citations and internal quotation marks omitted). However, when a party is "aware that material

outside the pleadings is before the court," the party has notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment. *Id.; see also Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 261 (4th Cir.1998) (commenting that a court has no obligation "to notify parties of the obvious"). Still, notice is not enough. Before a Rule 12(b)(6) motion may be converted and summary judgment granted, the court must be satisfied that the nonmoving party "has ... had the opportunity to discover information that is essential to [its] opposition." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(f)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 326 & n. 6, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Fare Deals had more than adequate notice that Hotwire's motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are in themselves sufficient indicia. *See Laughlin,* 149 F.3d at 260–61. Moreover, Fare Deals responded to the motion as if it might be disposed of as one for summary judgment and included its own affidavits and other exhibits. Fare Deals has also had adequate opportunity for discovery. If it had thought that further discovery was necessary to satisfactorily oppose summary judgment, Rule 56(f) obligated it to set out reasons for its need in an affidavit. *Celotex Corp.,* 477 U.S. at 326 & n. 6, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(f); *Laughlin,* 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate discovery when the nonmoving party failed to make an appropriate motion under Rule 56(f)). Fare Deals has not done so. Therefore, the Court will consider both Hotwire's and Fare Deals' affidavits and additional materials and will treat Hotwire's motion as a motion for summary judgment.

*STANDARD FOR SUMMARY JUDGMENT*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law. In *Anderson,* the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249, 106 S.Ct. 2505. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the opponent must bring forth evidence upon which a reasonable fact finder could rely, *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Because Fare Deals has failed to produce more than a scintilla of evidence to support its claims against Hotwire, this Court will therefore GRANT Hotwire's motion for summary judgment as to Counts I–VIII. Because Fare Deals has no standing under the Maryland Consumer Protection Act, the Court will also

GRANT Hotwire's motion to dismiss Count IX.

## ANALYSIS

 Solely the allegation that Hotwire developed and launched the <faredeals.com> web site in conjunction with other defendants distinguishes Fare Deals' claims against Hotwire from its claims against HRN.[4] Yet the affidavit of Hotwire's corporate counsel, attached to its motion, specifically denies any involvement in the registration, development, launch, or operation of the site. The affidavit has therefore discharged Hotwire's burden of pointing out the absence of evidence to support Fare Deals' case. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (explaining that the party moving for summary judgment bears the initial responsibility of showing the court that there is no genuine issue of material fact).

In opposition to such a properly supported motion for summary judgment, Rule 56(e) prevents the nonmoving party from resting on the mere allegations of its pleading; instead, the nonmoving party must present either affidavits of its own or point to the depositions, answers to interrogatories, and admissions on file to demonstrate the existence of a disputed material issue of fact. *See* Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 421–22 (4th Cir.1999). The only relevant evidentiary materials that Fare Deals can point to, it seems, are an affidavit of its executive vice president, Martin Sitnick, and an admission of defendant NetHoldings. Mr. Sitnick declares that in April 2001, after receiving a telephone call from an apparently confused customer, he "realized" that Hotwire had "developed and launched" the <faredeals.com> web

site in conjunction with other defendants. Sitnick Aff. at ¶ 10. Mr. Sitnick's "realization," however, amounts to no more than pure conjecture, which cannot create a genuine issue of material *fact* precluding summary judgment. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996) (indicating that affidavits that recite conclusory allegations unsupported by specific facts are insufficient to withstand a motion for summary judgment). NetHoldings does admit that "it developed and launched" the <faredeals.com> site "through an agreement with" Hotwire, but the only agreement it refers to is Hotwire's standard affiliate agreement, which nowhere suggests that Hotwire plays any role in developing and launching an affiliate's web site. NetHoldings Ans. at ¶ 16. Nothing, then, puts Hotwire's development of the <faredeals.com> site in dispute except Fare Deals' own complaint. To resist Hotwire's motion for summary judgment, however, Fare Deals' complaint is not enough. *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548.

### A. Cyberpiracy

Even if Hotwire had played some role in the development and launching of the <faredeals.com> web site, no evidence discloses any dispute over the fact that Hotwire was never a registrant of the domain name <faredeals.com> and never the licensee of any registrant of the name. No liability, therefore, can attach to Hotwire under the ACPA. *See* 15 U.S.C. § 1125(d)(1)(D).

### B. Federal False Designation of Origin and Trademark Dilution

#### 1. Direct Liability

Moreover, beyond the allegations of its complaint, Fare Deals has pointed to no

---

**4.** The terms of Hotwire's affiliate agreement, which Fare Deals has referred to and relied upon in its complaint, differ insubstantially from HRN's Letter Agreement. *See infra.*

evidence suggesting that Hotwire itself played any role in placing the "Fare Deals" mark in commerce. Therefore, no direct liability can attach to Hotwire for false designation of origin or trademark dilution under the Lanham Act. *See* 15 U.S.C. §§ 1125(a)(1), (c)(1), 1127.

### 2. *Vicarious Liability*

Nor does any evidence beyond Fare Deals' complaint generate a genuine, triable issue of either vicarious or contributory liability for trademark infringement. Fare Deals points to three pieces of evidence beyond its pleadings to demonstrate a principal-agent relationship between Hotwire and the owners or operators of the <faredeals.com> site: the affiliate agreement between Hotwire and the <economyreservations.com> site; the affidavit of Davida H. Isaacs, former counsel to Fare Deals; and the modification of the <faredeals.com> site by inclusion of a disclaimer of any relationship between <faredeals.com> and Fare Deals.

As the affidavit of Kathleen Philips, Hotwire's corporate counsel, attests-and Fare Deals does not contest-no affiliate agreement ever existed between Hotwire and the <faredeals.com> site. Philips Aff. at ¶¶ 10–13. Although Mr. Kaplan submitted an on-line application for <economyreservations.com>, which became a Hotwire affiliate on March 7, 2001, there is no record of any application for the <faredeals.com> site. Nevertheless, even if such an agreement had been actually executed, the terms of Hotwire's standard affiliate agreement refute any suggestion that an affiliate of Hotwire acts as its agent. The agreement specifically provides that affiliates are independent contractors, without authority to obligate or bind Hotwire in any way. Master Agrm't at ¶ 10.1. All consumer transactions referred to Hotwire by affiliates are conducted and concluded between Hotwire and the consumer. *Id.* at ¶ 3.3. Hotwire has no power to control

the operation or content of affiliated sites except to dictate the position and nature of the links that affiliates post to Hotwire. *Id.* at ¶ 2.1. Affiliates assume no duty to expend best efforts to promote Hotwire or to use Hotwire's services exclusively. The terms of the affiliate agreement therefore evince no intent on the part of Hotwire or any of its affiliates to enter into a principal-agent relationship.

Fare Deals nonetheless argues that the other two pieces of evidence indicate that Hotwire exercised a degree of control over the owners or operators of the <faredeals.com> web site substantial enough to preclude summary judgment on the issue of vicarious liability. *See Green*, 355 Md. at 503, 735 A.2d 1039 (recognizing the principal's right to control the alleged agent as one of several indicia of a principal-agent relationship). Ms. Isaacs, Fare Deals' former attorney, has stated that after she sent a letter to Hotwire demanding that Hotwire discontinue use of the <faredeals.com> site and threatening legal action, counsel to Hotwire contacted her and inquired whether a disclaimer would settle Fare Deals' complaints. Isaacs Aff. at ¶¶ 5–6. Within days, a disclaimer appeared on the <faredeals.com> site, immediately beneath the Hotwire link, disavowing any association between <faredeals.com> and Fare Deals. *Id.* at ¶ 8.

Aside from the dubious value of this evidence, however, a liminal difficulty confronts and possibly cripples Fare Deals' argument. In order to generate a triable dispute under Rule 56(c), an affidavit must contain facts that would be admissible at trial. Fed.R.Civ.P. 56(e); *see also Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 300 (4th Cir.1998). Rule 408 of the Federal Rules of Evidence excludes evidence concerning settlement or compromise of a claim when offered to establish liability.

The communication from Hotwire's to Fare Deals' counsel, in response to Fare Deals' threat of litigation, clearly represents an offer to settle the disputed infringement. *See Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 528 (3d Cir.1995) (interpreting Rule 408 to apply both to actual litigation and to less formal stages of a dispute). Yet Fare Deals apparently offers the evidence not to establish Hotwire's liability, but rather to prove that the owners or operators of the <faredeals.com> site were Hotwire's agents. For such a purpose, the evidence might be admissible. *See Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (observing that Rule 408 does not prohibit the use of compromise evidence if offered to prove something other than liability for or invalidity of a claim or its amount).

The use of compromise evidence to show agency, however, is problematic. Suppose, for example, the issue is whether the driver of the car that struck the plaintiff was an employee of the defendant corporation, and the plaintiff offers evidence that the corporation tried to settle his claim for damages arising out of the accident. In proving agency, the plaintiff is in fact attempting to prove the vicarious liability of, and so the validity of his claim against, the defendant. *Compare* 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5314 at 280–81 (1980) (arguing that Rule 408 does not permit use of compromise evidence to establish a claim of respondeat superior) *with* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 408.08[2] at 408–31–32 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2001) (arguing the opposite). The statement of Hotwire's attorney may therefore be inadmissible, and, if so, it cannot be considered in determining Hotwire's summary judgment motion.

Assuming, nevertheless, that the statement is admissible, it provides but nebulous evidence of a principal-agent relationship-evidence too nebulous to discern the quantum of evidence beyond a scintilla needed to stave off summary judgment. Nor does the addition of the disclaimer itself, which Ms. Philips attests Hotwire had no authority to require and did not require the owners or operators of <faredeals.com> to display, kindle any brighter evidentiary flame. Philips Aff. at ¶ 16. Because Fare Deals has pointed to no other evidence indicating the existence of a principal-agent relationship between Hotwire and the owners or operators of the <faredeals.com> web site, there is no triable issue of vicarious liability.

3. *Contributory Liability*

Fare Deals has not alleged that Hotwire intentionally induced the owners or operators of the <faredeals.com> site to infringe its mark. Furthermore, like HRN, Hotwire never provided a product to the <faredeals.com> web site. Therefore, under *Inwood Laboratories* and its non-product progeny, to prove Hotwire contributorily liable for any infringement of Fare Deals' mark, Fare Deals must prove both that Hotwire directly controlled and monitored the activities of the <faredeals.com> site and that Hotwire had actual or constructive knowledge of the infringement. *See Inwood Labs.*, 456 U.S. at 854, 102 S.Ct. 2182; *Lockheed Martin Corp.*, 194 F.3d at 984.

As the analysis of Hotwire's vicarious liability has indicated, the evidence demonstrates that Hotwire had virtually no control over the operation of the <faredeals.com> web site. *See* Master Agrm't at ¶¶ 2.1, 4.1; Philips Aff. at ¶ 9. The only evidence that Fare Deals tenders to suggest otherwise-Hotwire's inquiry whether a disclaimer would settle Fare Deals' claim

(if admissible) and the subsequent appearance of the disclaimer on the <faredeals.com> site-does not suggest enough. Hotwire never advertised or promoted the <faredeals.com> site; nor did it direct any of its customers there. It provided neither the medium of infringement nor an exclusive service without which the infringement could not take place. Under the principles articulated in *Lockheed Martin, Fonovisa,* and *Hard Rock Cafe,* Hotwire simply did not control and monitor the <faredeals.com> web site to such an extent as to impose upon it any contributory liability. *See Lockheed Martin Corp.,* 194 F.3d at 984–85; *Fonovisa, Inc.,* 76 F.3d at 264; *Hard Rock Cafe Licensing Corp.,* 955 F.2d at 1148.

Nor, even if Hotwire had exercised the requisite control, does the evidence demonstrate that Hotwire had the requisite knowledge of infringement to hold it contributorily liable. Fare Deals has pointed to no facts that show that Hotwire had either actual or constructive notice of any possible infringement prior to receipt of Fare Deals' May 2, 2001, letter, which erroneously accused Hotwire of having registered the <faredeals.com> domain name. Indeed, prior to that letter, Hotwire was not even aware that the <faredeals.com> site existed or that a link connected the site to Hotwire. Philips Aff. at ¶¶ 11–14. Fare Deals' subsequent demand letter, dated May 9, 2001–just as Fare Deals' demand letter to HRN-certainly gave Hotwire notice of Fare Deals' own position regarding infringement by the <faredeals.com> web site, and-just as Fare Deals' demand letter to HRN-it may have given rise to a duty on the part of Hotwire to look into the matter. It did not, however, obligate Hotwire to immediately terminate the link from <faredeals.com> any more than the demand letter to HRN obligated HRN to do so. Further, any investigation that might have been undertaken by Hotwire-as by HRN-

would not readily have uncovered the claimed infringement. Fare Deals' registration of the mark did not even issue from the Patent and Trademark Office until July 17, 2001–over a month after this Court had entered its temporary restraining order enjoining NetHoldings' use of the disputed site. In sum, Fare Deals' scant evidence of knowledge or willful blindness cannot withstand Hotwire's motion for summary judgment.

### C. Common–Law Unfair Competition and Trade Disparagement

Because Fair Deals has pointed to insufficient evidence to support its claims under the Lanham Act, its claims under Maryland common law for unfair competition and trade disparagement likewise cannot withstand Hotwire's summary judgment motion. *See HQM, Ltd.,* 71 F.Supp.2d at 504–05 & n. 17 (treating federal statutory and Maryland common-law claims of unfair competition identically).

### D. Tortious Interference

To prove that Hotwire tortiously interfered with its economic relationships, Fare Deals must prove, *inter alia,* that Hotwire maliciously intended to damage Fare Deals' business relations with others. *See Alexander & Alexander, Inc.,* 336 Md. at 652, 650 A.2d 260; *K & K Management, Inc.,* 316 Md. at 158–63, 557 A.2d 965. To prove such malicious intent, Fare Deals has pointed only to Hotwire's standard affiliate agreement. The terms of that agreement, however (assuming, *arguendo,* that Fare Deals could establish that the <faredeals.com> site was a Hotwire affiliate), demonstrate that Hotwire was doing no more than pursuing its legitimate business interests-licensing others to use *its own* mark on their web sites. The agreement even requires affiliates to represent that they will not interfere with the rights

of others. Master Agrm't at ¶ 6.1. Therefore, the evidence Fare Deals points to does not adequately support its claim of tortious interference. *See Alexander & Alexander, Inc.*, 336 Md. at 654, 650 A.2d 260 (remarking that legitimate competition is not a tort).

### E. *Civil Conspiracy*

Because Fare Deals has failed to demonstrate sufficient evidence of Hotwire's liability for any substantive tort, its claim of civil conspiracy must likewise succumb to Hotwire's motion for summary judgment. *See id.* at 645 n. 8, 650 A.2d 260 (reiterating that " 'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff") (citing *Kimball v. Harman*, 34 Md. 407, 410–11 (1871)).

### F. *The Maryland Consumer Protection Act*

Because Fare Deals is not a "consumer" as statutorily defined, it lacks standing to assert any claim against Hotwire under the CPA. *See Boatel Indus.*, 77 Md.App. at 302–04, 550 A.2d 389. Its claim must therefore be dismissed.

### CONCLUSION

For the foregoing reasons, a separate order will be issued GRANTING defendant HRN's motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted, GRANTING defendant Hotwire's motion for summary judgment as to Counts I–VIII, and GRANTING defendant Hotwire's motion to dismiss the plaintiff's complaint as to Count IX.

### ORDER AND JUDGMENT

For the reasons set forth in the Memorandum Opinion of even date, it is, this 20th day of November, 2001, hereby ORDERED and ADJUDGED:

1. That the motion of Defendant Hotel Reservations Network, Inc., to dismiss all counts of Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted BE, and it hereby IS, GRANTED;

2. That the motion of Defendant Cimo, Inc., d/b/a Hotwire, to dismiss Count IX of the Amended Complaint for failure to state a claim upon which relief can be granted BE, and it hereby IS, GRANTED;

3. That the motion of Defendant Cimo, Inc., d/b/a Hotwire, for summary judgment as to Counts I–VIII of the Amended Complaint BE, and it hereby IS, GRANTED;

4. That judgment BE, and it hereby IS, ENTERED in favor of Defendant Cimo, Inc., d/b/a Hotwire, on Counts I–VIII of the Amended Complaint; and

5. That the Clerk of the Court send copies of this Order and the Memorandum Opinion to counsel for the Parties.